LAW OFFICES OF SIMON HARTER, ESQ.
Simon Harter (SH-8540)
304 Park Avenue South – 11th Floor
New York, New York 10010
(212) 979-0250 – Phone
(212) 979-0251 – Fax
Attorneys for Plaintiff, Ardemar Marine Limited

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

ARDEMAR MARINE LIMITED,                  :

           Plaintiff,          :          07-CV-10467 (CM)

  -against-                                           :

NOVEL COMMODITIES S.A.,             :          **VERIFIED COMPLAINT**

           Defendant.          :

------------------------------------------------------------x

      Plaintiff, ARDEMAR MARINE LIMITED, by its Attorneys, Law Offices of Simon

Harter, Esq., as and for its Verified Complaint against the named Defendant, NOVEL

COMMODITIES S.A., alleges upon information and belief as follows:

      1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of

the Federal Rules of Civil Procedure, in that it involves claims for breach of a maritime contract

of charter party.  This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333, and this Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331.  Finally, this Court also has jurisdiction over this matter because the action also arises

under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, and the Convention on the Recognition

and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201 *et seq.*

2.    At all times relevant hereto, Plaintiff was and still is a foreign business entity organized and existing under the laws of Cyprus with a registered office at 24a Archimedous Street, Engomi, Nicosia 2411, Cyprus.

3.    At all times relevant hereto, Defendant was and still is a foreign business entity organized and existing under the laws of Switzerland with a registered office at Rue de Carobiers 21, 1227 Carouge GE, Switzerland.

4.    On or about June 29, 2007, Plaintiff, in the capacity as owner, entered into a maritime contract of charter party, written on an amended New York Produce Exchange form, with Defendant, under which Plaintiff agreed to let and Defendant agreed to charter the Motor Vessel SUMY for a period of time commencing between July 8 and 15, 2007 and extending to a period of time necessary for the delivery of cargo to ports in West Africa.   Pursuant to the terms and conditions of the charter party, Defendant was obligated to pay Plaintiff the sum of US $21,000.00 per day pro rata, including overtime, in hire for the charter of the aforementioned Vessel.

5.    A copy of the contract and its additional clauses is attached hereto as Exhibit "A" and incorporated by reference herein.

6.    Plaintiff delivered to Defendant the aforementioned Vessel under the terms of the contract which was conforming in all respects to the conditions specified in the charter.

7.    On or about July 28, 2007, as the Vessel was being loaded at Kocichang, Thailand, the stevedores, which were appointed and paid by Defendant, caused one of the Vessel's cranes to collapse, which then caused that crane to collide with another of the Vessel's cranes. The collapse of the cranes caused extensive damage not only to the cranes but to the Vessel as well.

8.     The additional clauses to the charter party provides, in Clause 50, that Defendant is liable for any damage to the Vessel that is incurred during loading and unloading provided that the Master of the Vessel notifies Defendant of the damage within twenty-four hours. The Master of the Vessel fully complied with the requirements of Clause 50. A copy of the correspondence from the Vessel's Master detailing the events and notifying Defendant of the resulting damage is attached hereto as Exhibit "B" and incorporated by reference herein.

9.     Clause 50 also requires that the responsible party immediately repair any damage that affects the seaworthiness of the Vessel. Additionally, Clause 50 provides that if the responsible party fails to make repairs, then Defendant is responsible to repair the damage before the Vessel commences its voyage.

10.     The stevedoring company did not make the necessary repairs to the Vessel and Defendant refused to make the repairs.

11.     As a consequence of Defendant's refusal to make the repairs, which it was obligated to make pursuant to the charter party, Plaintiff was compelled to make arrangements for the necessary repairs in Singapore. In order for the Vessel to continue its voyage, Plaintiff paid for the repairs and associated costs, which totaled US $323,448.58. Copies of the invoices detailing the repairs and associated costs born by Plaintiff are attached hereto as Exhibit "C" and incorporated by reference herein. Please note that each of the attached invoices are delineated in US Dollars, with the exception of the repair costs, which are delineated in Singapore Dollars. As of the date of this Verified Complaint, the rate of exchange is SGD 1 = US $0.682454.

12.     The Vessel was in Singapore for approximately twenty-five days receiving the necessary repairs to make her again seaworthy. During this time Defendant unilaterally placed the Vessel off-hire and subsequently deducted sums rightly owed to Plaintiff. The total sum that

Defendant deducted amounted to US $627,623.07.  A copy of Defendant's final hire statement is attached hereto as Exhibit "D" and incorporated by reference herein.

13.    As a consequence of the foregoing, Defendant is in breach of the contract of charter party, which breach has resulted in Plaintiff suffering damages in the amount due and owing.

14.    The charter party provides, in Rider Clause LMAA, that any disputes arising thereunder shall be submitted to arbitration in London, England and according to English law.

15.    Plaintiff specifically reserves the right to arbitrate the substantive matters in dispute pursuant to the aforementioned arbitration provision.

16.    In addition to an attachment in the full amount of the claim as outlined above, Plaintiff also seeks an attachment over an additional sum to cover interest and its anticipated attorneys' fees in the arbitration of this dispute, as, and to the extent, recoverable under English Law.

17.    Plaintiff estimates, as nearly as can be computed, these additional damages/costs to be US $342,965.90, comprised of interest in the sum of US $202,965.90 (computed on the principal amount sought at a rate of 6.5%, compounded quarterly, for a period of three years – the estimated timeframe within which arbitration will be completed); and US $140,000.00 estimated U.K. counsel fees, which will be incurred in conjunction with the London arbitration, and which are recoverable under English law.

18.    Based upon the foregoing, the sum total sought to be attached in this action is US $1,294,037.55, consisting of Plaintiff's principal claim of US $951,071.65, interest of US $202,965.90 and recoverable legal fees and costs of US $140,000.00.

19.    Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, but Plaintiff avers, on information and belief, that Defendant has, or will have during the pendency of this action, assets within this District comprising, *inter alia*, cash, funds, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, or any other tangible or intangible property, of, belonging to, due, claimed by or being held by or for the benefit of Defendant (hereinafter "assets"), located at, moving through, or held by, any garnishee(s) located within this District, including but not limited to HSBC (USA) Bank; Bank of America N.A.; The Bank of New York; Citibank N.A.; JPMorganChase Bank; Standard Chartered Bank; Wachovia Bank N.A.; Deutsche Bank AG; Barclays Bank PLC; UBS A.G.; Credit Suisse; Nordea Bank Finland PLC; Fortis Financial Services LLC; ABN-AMRO Bank N.V.; American Express Bank Ltd; Bank of China, and/or others.

20.    Plaintiff, for its part, has satisfied all of its obligations under the terms of the charter party.

**WHEREFORE**, Plaintiff, ARDEMAR MARINE LIMITED, prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant, NOVEL COMMODITIES S.A., citing it to appear and answer the foregoing, and failing such appearance and answer, to have judgment by default against the Defendant in the principal amount of the claim, plus interest, costs and reasonable attorneys' fees;

b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant up to and including the sum of $1,294,037.55 may be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due, or for the benefit of, Defendant, including but not limited to such assets as may be held, received or transferred in their own name or as may be held, received or transferred for its benefit at, moving

through, or within the possession, custody or control of banking institutions including but not limited to HSBC (USA) Bank, Bank of America N.A., The Bank of New York, Citibank N.A., JPMorganChase Bank, Standard Chartered Bank, Wachovia Bank N.A., Deutsche Bank AG, Barclays Bank PLC; UBS A.G.; Credit Suisse; Nordea Bank Finland PLC; Fortis Financial Services LLC; ABN-AMRO Bank N.V.; American Express Bank Ltd; Bank of China and/or any other garnishees(s) upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served;

c.    That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary in order to give effect to the London arbitration; and

d.    For such other, further and different relief as this Court may deem just and proper in the circumstances.

Dated:    November 19, 2007


**LAW OFFICES OF SIMON HARTER, ESQ.**
Attorneys for Plaintiff,
ARDEMAR MARINE LIMITED

By: _____

Simon Harter (SH-8540)
304 Park Avenue South – 11th Floor
New York, New York 10010
(212) 979-0250 (Phone)
(212) 979-0251 (Fax)

## ATTORNEY VERIFICATION

STATE OF NEW YORK        )
                         )  ss.:
COUNTY OF NEW YORK       )

      **SIMON HARTER** verifies the following pursuant to 28 U.S.C. §1746:

1.    I am a member of the Law Offices of Simon Harter, Esq., Attorneys for Plaintiff, ARDEMAR MARINE LIMITED, in this action and a Member of the Bar of this Honorable Court. I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.    The sources of my information and the grounds for my belief are communications, information, and documentation provided by the Plaintiff and/or its duly authorized agents.

3.    The reason this Verification is made by an attorney and not the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

      I declare under penalty of perjury that the foregoing is true and correct.

New York, New York
Executed on the 19th day of November, 2007.

Simon Harter (SH-8540)
Law Offices of Simon Harter, Esq.
304 Park Avenue South – 11th Floor
New York, New York 10010
(212) 979-0250 - Phone
(212) 979-0251 - Fax

EXHIBIT "A"

# Time Charter

## GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1    **This Charter Party**, made and concluded in Paris, .....................................the 29th. day of *June* .....................................~~19~~ *2007*

2    Between *ARDEMAR MARINE LIMITED, Nicosia, Cyprus* ......................................................................................................... ~~indicated horse power~~

3    ~~Bareboat-Charterers~~ Owners of the good

4    *Ukrainian* .......................... ~~Steamship~~/Motorship *M/V 'SUMY'* ......................................................................

4    of *14.136.*......................... tons gross register, and *7.973* .......................... tons net register, ~~having engines of~~ .......................... ~~indicated horse power~~

5    and with hull, machinery and equipment in a thoroughly efficient state, and classed *Russian Maritime Register of Shipping (RMRS)* ..........................

6    ~~at~~ .......................... of about *28.404 cbm* ............................ ~~cubic feet~~ bale capacity, *clean and available for cargo* and about *22.904 metric* .......................... ~~tons of 2240 lbs.~~

7    deadweight capacity ~~(cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity~~

8    ~~allowing a minimum of fifty tons)~~ on a draft of *9,94 metres* .......................... feet .......................... inches on .......................... Summer freeboard, inclusive of permanent bunkers,

9    which are of the capacity of ~~about~~ .......... *as per clause 29* .......................... ~~tons of fuel,~~ and capable of steaming, fully laden, under good weather

10    conditions about *12,5* .... knots on a consumption of about *20 metric*. tons of IFO 180 CST plus 1,8 metric tons MDO daily ~~best~~

10    ~~Welsh coal  best grade fuel oil  best grade Diesel oil,~~

11    now *trading* .......................... ...................................................................................................................................................................................................

12    .......................... and *NOVEL COMMODITIES S.A.* .......................................................................................... Charterers of the City of *Geneva.*..........................

13    **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14    ~~about~~ *one time-charter trip via safe anchorage(s/safe berth(s)/safe port(s) always afloat, always within Institute Warranty Limits (but see*

14    *also exclusions of clause 41) with bagged rice to WEST AFRICA.*

15    .......................................................................................................................................... within below mentioned trading limits.

16    Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17    the fulfillment of this Charter Party.

18    Vessel to be placed at the disposal of the Charterers, ~~at~~ *on dropping last outward sea pilot station COLOMBO at any time, day or night,*

18    *Sundays and Holidays included.* ..........................................................................................................................................

19    ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~

20    ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her delivery to be

21    ready to receive *any permissible* cargo with clean-swept holds, *dry, free of rust scales, insects, smell to Charterers' satisfaction* and tight,

22    staunch, strong and in every way fitted for the service, having water ballast, ~~winches and~~

23    ~~donkey-boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same~~

24    ~~time~~ (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25    dise, ~~including petroleum or its products, in proper containers,~~ excluding *see clause 73* ..........................................................................................

26    (vessel is not to be employed in the carriage of Live Stock, but ~~Charterers are to have the privilege of shipping a small number on deck at their risk,~~

27    ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~

28    ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

29    ~~Mexico, and/or South America,~~ ................................................................................................................. ~~and/or Europe~~

30    ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand,~~ but excluding *Magdalena River, River St. Lawrence between*

31    ~~October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding when out of season, White Sea, Black Sea and the Baltic,~~

32  *Trading limits as per clause 41.*

33

34

35

36  as the Charterers or their Agents shall direct, on the following conditions:

  1. That the Owners shall provide and pay for all provisions, *including garbage removal,* wages and consular shipping and discharging fees of the Crew; *also all consular fees necessitated because of vessel's nationality or flag,* shall pay for the

37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38  the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

39  2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except *lubricating oil* as otherwise agreed, Port, *Canal Charges,*

*compulsory* Pilotages, Agencies, Commissions,

40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44  of six months or more.

45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47  for dunnage, they making good any damage thereto.

48  3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

49  ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ ............... ~~tons, and not more than~~

50  ............... ~~tons and not be to be delivered with not less than~~ ............... ~~tons and not more than~~ ............... ~~tons. See clause 65.~~

51  4. That the Charterers shall pay for the use of the said Vessel at the rate of USD 21,000,00 (twenty one thousand US Dollars) .......................

52  ....................... United States Currency *daily including overtime* ~~per ton on vessel's total deadweight carrying capacity, including bunkers and~~

53  ~~stores, on~~ ............... ~~summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at

54  and after the same rate for any part of a *day* ~~month,~~ hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55  wear and tear excepted, to the Owners (unless lost) *at on passing or on dropping outward pilot one safe port LUANDA-NOUAKCHOTT*

*Range, both ports included, at any time, day or night, Sundays and Holidays included* .......................

56  ....................... unless otherwise mutually agreed. Charterers are to give Owners not less than *15/10/7/5* days

57  *approximate and 3 days definite* notice of vessels expected date of re-delivery, and probable port.

58  5. Payment of said hire to be made in *Nicosia* ~~New York~~ *to Owners' nominated bank account* ~~in cash~~ in United States Currency,

  ~~semi-monthly~~ *15 days* in advance, and for the last half month or

59  part of same the approximate amount of hire *to be settled as per clause 59,* and should same not cover the actual time, hire is to be paid for the balance

  day by day, as it becomes

60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from *delivery of the vessel in*

*accordance with line 18* ~~7 a.m. on the working day~~

63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64  ~~to have the privilege of using vessel at once, such time still to count as hire.~~

65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67  of such advances.

68  6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

70  ~~lie aground.~~

71  7. That the whole reach of the Vessel's Hold, Decks, *(see clause 79)* and usual places of loading (not more than she can reasonably stow and

carry), also
accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers to far as accommodation allow. Charterers~~
~~paying Owners~~.......................per day per passenger for the carriage of passengers. ~~Charterers are to bear such risk and expense~~.
~~incurred in the consequences of the carriage of passengers. Charterers are to bear such risk and expense~~. However, it is agreed that in case any fines or extra expenses are
boats. The Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
agency; and Charterers are to load, stow, ~~and~~ trim, *lash, unlash, secure, unsecure, dunnage, undunnage with tally to be paid by party ordering*
*same but if compulsory same to be paid by Shippers/Receivers/Charterers, and discharge* the cargo at their expense under the supervision *and*
*responsibility* of the Captain, who is to sign Bills of Lading for
cargo as presented, in conformity with Mate's ~~or Tally Clerk~~ receipts.

9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments *(see also clause 34)*

10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
rate of *USD 10.00 $1.00* per day.  Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual
Tally
Clerks, Stevedore's Foreman, etc., ~~Charterers paying at the current rate per meal, for all such victualling~~.

11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
terers, their Agents or Supercargo, when required, with a true copy of daily Logs, *abstracts* showing the course of the vessel and distance run and the con-
sumption of fuel.

12.    That the Captain shall use diligence in caring for the ventilation of the cargo.

~~13.    That the Charterers shall have the option of continuing this charter for a further period of~~...........................
~~on giving written notice thereof to the Owners or their Agents~~.....................days previous to the expiration of the first named term, or any declared option.

14.    That if required by Charterers, time not to commence before *8th July 2007*................................... and should vessel
not have given written notice of readiness on or before *15th July 2007*............................but not later than 4 p.m. *24.00 hours local time* Charterers or
their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

15.    That in the event of the loss of time from deficiency *and/or default* of men *including strike of Master, Officers and crew* or stores, fire,
breakdown or damages to hull, machinery or equipment,
grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
*whatsoever*
preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
defect in or breakdown of any part of her hull, machinery or equipment , the time so lost *until the vessel is again at Charterers' disposal in the*
*same or equidistant position as required by Charterers and has resumed the service performed prior to the off hire event*, and the cost of
any extra fuel consumed in consequence
thereof, and all extra expenses shall be deducted from the hire.

16.    That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
purpose of saving life and property *when vessel to be off hire until she is back in the same or equidistant position*.

17.    ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~
~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

18.    That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114 19.   That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116 York-Antwerp Rules 1924, *in London* ~~at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by~~
117 ~~these~~
118 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
119 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
120 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
121 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such deposit as the carrier~~
122 ~~or his agents may deem sufficient to additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
123 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
124 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
125 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
126 ~~United States money.~~
127 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
128 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
129 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
130 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
131 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
132 ~~ship belonged to strangers.~~
133   Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
134 20.   Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves, to be agreed to as to quantity,~~ and the
135 cost of replacing same, to be allowed by Owners.
136 ~~21.   That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
137 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
138 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
139
140   22.   Owners shall maintain the gear of the ship as fitted, providing gear (for all ~~derricks~~ *cranes*) capable of handling lifts *as per description*
      *clause 29* ~~up to three tons,~~ also
141 providing ropes, falls, slings and blocks *as on board.* If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary
      gear for
142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *electric light* ~~lanterns and oil~~
      for
143 night work, *sufficient to work all hatches simultaneously* and vessel to give use of electric light when so fitted, but any additional lights over those
144 on board to be at Charterers' expense. The
      Charterers to have the use of any gear on board the vessel.
145   23.   Vessel to work night and day, if required by Charterers, and all ~~winches~~ *cranes and/or vessel's equipment* to be at Charterers' disposal
      during loading and discharging;
146 ~~steamer to provide one winchman per hatch to work winches day and night as required. Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150 ~~thereby.~~
151   24.   It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;

153 etc.," in respect of all cargo shipped under this charter to or from the United States of America. ~~It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder:~~
155
156 ~~U.S.A. Clause Paramount~~
157 ~~This bill of lading shall have effect subject to the provision of the Carriage of Goods by Sea Act of the United States, approved April~~
158 ~~16, 1936, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of~~
159 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
160 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

161 ~~Both to Blame Collision Clause~~
162 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
163 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
164 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
165 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
166 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
167 ~~owners as part of their claim against the carrying ship or carrier.~~

168 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
169 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
170 port or to get out after having completed loading or discharging.
171 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
navigation of the vessel *including acts of pilots, tug boats and linemen*, insurance, crew, and all other matters, same as when trading for their own
account.

172 27. A commission of *1.25 2-1/2* per cent is payable by the Vessel and Owners to *SEA SATIN SHIPPING S.A., Piraeus*
173 ................................................................................................................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28. An address commission of 2 1/2 per cent payable to *the Charterers* ........................... on the hire earned and paid under this Charter.

*Clauses 29 to 85, both inclusive, as well as questionnaire, are to be considered as part of this charter party.*

        *THE BAREBOAT CHARTERERS :*                    *THE CHARTERERS :*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.

<u>**ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE M/V "SUMY"**</u>
<u>**DATED PARIS 29th JUNE 2007**</u>

29. Vessel's description :

MV SUMY

1) NAME, EX NAMES: MV SUMY EX IKAN BELANAK
2) TYPE: BULK CARRIER
3) CLASS: RUSSIAN MARITIME REGISTER OF SHIPPING(RMRS) KM*BULK CARRIER
4) OFFICIAL REGISTER NO.: 542
5) LLOYD'S REGISTER NO.: ABS - 7807920
6) YARD AND YEAR BUILT: 11.1978, OSAKA SHIPBULDING CO.LTD, JAPAN
7) FLAG, HOMEPORT: UKRAINE,MARIUPOL
8) GRT/NRT INTERNATIONAL: 14136 / 7973 RT
9) CALL SIGN.: UVYH
10) LOA, LBP, BEAM: 164,59 / 156.00 / 22,86 M
11) DEPTH MOULDED : 13,70 M
12) PCT : 31,68
14) BUNKER CONSUMPTION IN PORT PER 24 HOURS:
    CARGO OPERATION MDO 1.8 MT
    NO CARGO OPER. MDO 1.3 MT
15) BUNKER FUEL CAPACITIES: IFO 1050 MT / MDO 100 MT
16) WATER BALLAST TANK CAPACITY: 6,875.80 MT
    WATER BALLAST 3TD HOLD CAPACITY: 5106.8 MT
18) DWAT IN METRIC TONS:
    SUMMER: 22904 / 9.94
19) NUMBER AND SIZES OF HATCHES: L / B
    HOLD        NO 1 12.8 X 9.2
                  2 27.2 X 11.4
                  3 13.6 X 11.4
                  4 27.2 X 11.4
20) TYPE OF HATCH COVERS: MACGREGOR ROLLER
21) BELOW STATED CUBIC CAPACITIES FOR CARGO, INCLUDING HATCHCOAMING SPACE:

| | CBM. | GRAIN / BALE |
|---|---|---|
| HOLD NO 1 | 3889 / | 3703 |
| 2 | 10277 / | 10057 |
| 3 | 4971 / | 4956 |
| 4 | 9901 / | 9688 |
| TTL | 29038 / | 28404 |

22) CONSTANTS        : ABOUT 200 MT
    FRESHWATER CAPACITY : 302 MT
    FRESHWATER CONSUMPTION: 8 TPD
24) MAXIMUM UNIFORM LOAD ON:
    TANKTOP: HOLDS NOS 1,2,4    - 13.18 T/M2
    HOLD NO 3               - 14.37 T/M2
    HATCHCOVERS :         - 1.84 T/M2
    UPPER DECK :          - 3.08 T/M2
26) CARGO GEAR,
    4 ELECTROHYDRAULIC (SINGLE) , SWL 25 T , MAX OUTREACH 22 M
28) LIGHT DRAFT FORE: 0.31 M
                 AFT: 4.44 M
            AIRDRAFT: 41,293 M
DISTANCE WLHCT BASIS FULL WATERBALLAST AND 30PCT BUNKERS, STORES:
FORWARD H.NO 1 - 11.5 M
    AFT H.NO 4 - 10.45 M
29) NUMBER AND SIZE OF HOLDS (CLEAR LENGTH X BREADTH X HEIGHT):
    HOLD NO  1 20.0 X 14.0 X 13.2
             2 38.4 X 19.6 X 14.0
             3 20.0 X 19.6 X 14.0
             4 38.4 X 19.6 X 14.0

1

**ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE M/V "SUMY"**
**DATED PARIS 29th JUNE 2007**

29. Continued …

30) MAIN ENGINE.
    MAKE AND TYPE: DIESEL  6K62EF OF BW
    DESIGNED MCR BHP: 8300  / 6108 KW /
    DESIGNED NCR BHP: 5620  / 4130 KW /
    MAIN ENGINE DESIGNED CONSUMPTION: IFO 21.0/MDO 1.8
31) CONSUMPTION : AT SEA
    ABOUT 12.5 KNTS ON ABT 20 T IFO + 1.8T MDO AT SEA
    CONSUMPTION AT PORT:
    WITH CARGO OPERATION WWW 24H : MDO 1.8 MTPD
    WITHOUT CARGO OPERATION : MDO 1.3 MTPD
    WHEN BOILER IS USED : IFO 1.0 MTPD

A) FITTED WITH AUSTRALIAN HOLD LADDERS ACCORDING TO AUSTRALIAN RULES AND REGULATIONS - YES
B) STEELFLOORED THROUGHOUT IN ALL HOLDS STRENGTHENED AND SUITABLE FOR GRAB DISCHARGE - YES
C) FULLY LOGS/TIMBER FITTED WITH ALL LOOSE LASHING MATERIAL AND CHAINS AND STANCHIONS - NO
D) SELFTRIMMING IN ALL HOLDS - YES
E) STRENGTHENED FOR THE CARRIAGE OF HEAVY CARGOES AND SUITABLE FOR ALTERNATE HOLDS LOADING - YES
F) FITTED FOR CARRIAGE OF GRAIN IN ACCORDANCE WITH SOLAS 1974 AND  LATER AMENDMENTS WITHOUT REQUIRING BAGGING, STRAPPING OR SECURING WHEN LOADING A FULL (DEADWEIGHT) CARGO OF HEAVY GRAIN  IN BULK (STOWAGE FACTOR 42 CBFT/MT) WITH ENDS UNTRIMMED - YES

ALL DETAILS 'ABOUT'

Type of ventilation : natural

Owners  give vessel's speed at about 12,5 knots. If however vessel stays at loading port over 25 days and ship's bottom will catch barnacles, Owners will not bear any responsibility if ship's speed will be lower.

Vessel to be highest class at RMRS, member of IACS without any outstanding class recommendation or condition imposed that may affect of this voyage and fully P. & I. covered with all current premia paid and is not subject to any know breach of club rules at "BRITISH MARINE LUXEMBOURG S.A.", both during whole performance of the charter party.
Both for class and P. & I. club, Owners to fax valid certificates confirming above for cargo Underwriters'/Charterers' approval, including updated/valid ISM (Document of Compliance + Safety Management) and cargo gears certificates, whenever applicable.

Owners guarantee that vessel has 4 cranes of 25 tons each which can serve all hatches and that all holds/hatches, derricks/cranes are workable simultaneously.

Owners undertake to keep Charterers very closed posted of vessel's position and inform them right away of any change in ETA  loading port failing which all proven damages to be for Owners' account.

Owners confirm that hatches are watertight and rubber gaskets are new failing which Owners undertake  to round up hatch covers with ramneck tape at their time and expense. All hatch cover are to be carefully attended by the Officers and crew to prevent leakages.

Owners warrant vessel can trade freely worldwide and is not affected by any embargo/restriction imposed by any  international organization.

Vessel guaranteed as suitable for loading/discharging bagged rice.

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE M/V "SUMY" DATED PARIS 29ᵗʰ JUNE 2007

29. Continued ..

Vessel is registered at IACS Highest Class or equivalent and Owners to supply copies of vessel's valid class and gear certificates. Owners guarantee all holds/hatches, derricks/cranes workable simultaneously.

Owners guarantee that the vessel to be safe in ballast condition, and it is agreed that if any solid ballast is required, all expenses for same, including time used in loading and discharging solid ballast, to be for Owners' account.

Owners warrant that vessel is suitable for the carriage of general cargo in bags/packages.

The vessel's holds and any other cargo compartments are to be thoroughly cleaned, dried after fresh water washing prior tendering notice for delivery, free from all residues of previous cargoes, loose rust scale, insects, and odourless before delivery, and must not be painted immediately before delivery and/or during the charter period without Charterers' express and written permission. Vessel's hold cleanliness not to be in excess of that required for grain as ascertained by an independent Surveyor. In case holds rejected, vessel to be off hire until holds passed.

Lighting : The vessel is to supply at any time sufficient lights as on board, to allow night work on deck and in all holds simultaneously.

On delivery under this time charter, the vessel to be free of all infestation. See also attached questionnaire for further details.

30. For operation purpose :

Call sign : UVYH
Vessel to have following plans on board :
Capacity plan and deadweight scale together with copy of trimming scale and general arrangement plan.

31. Performance Clause :

Charterers shall have the option of supplying A W T or any other similar organization's advice to Master during the voyage(s). The Master shall comply with the reporting procedure of the routing service. The vessel shall be capable of steaming at all times in good weather during the currency of this charter party as described in Clause 29. For the purpose of this charter party "good weather conditions" shall be defined as weather conditions in winds not exceeding Beaufort force 4.

Evidence of weather reports to be taken from ship's deck log and independent weather bureau reports. In the event of consistent discrepancy between the deck logs and the independent weather bureau reports then the independent weather bureau reports to be taken as ruling. In the event of dispute over an apparent breach of the speed and consumption warranty of this charter party, the performance data supplied by A W T or similar and independent weather bureau shall be taken as binding on both parties.

32. Owners confirm that the vessel has not traded Cuba in the last 6 months and has not traded former U.S.S.R. Pacific ports since our Ownership.

33. Vessel to be in possession of the necessary certificates and equipment to comply with safety and health regulations and all current requirements at all ports of call during the currency of this charter.

34. With reference to Clause 9 of this charter party it is agreed that this provision does not affect the Charterers' right to advance any claim or require Arbitration under Clause 17 in case of any dispute regarding the conduct of the Master in the execution of his voyage(s) and in carrying out the orders and directions of the Charterers.

3

**ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE  M/V "SUMY"
DATED PARIS 29th JUNE  2007**

35. The vessel to be delivered with valid deratization/exemption certificates and, if these do not cover the whole period of the time charter and fumigation is again necessary due hereto or due to anything for which Owners are responsible, cost of same and detention to be for Owners' account. If fumigation is necessary on account of cargo carried under this charter party cost of same and time to be for Charterers' account

Charterers have the option to fumigate the cargo on board with usual fumigants and crew to remain on board.

Fumigation to be effected on the vessel by the Charterers after completion of loading at Charterers' expenses. Owners/Master confirm vessel is suitable for "in sea transit fumigation" and vessel to sail once fumigation products are placed on board and hatches are closed  against a letter issued by the Master of the carrying vessel(s) confirming  that hatches will be kept closed for minimum 72 hours at sea at their own risks, thereafter vessel degazing at sea.

Fumigants/ chemicals to be in Charterers' option with Charterers' option to use methyl bromide/ phostoxine or any other approved products. Master not to clause Bills of Lading for reasons of such fumigation or for reasons of insects having been detected in the cargo prior to such fumigation.

36. The vessel's cargo gear and all other equipment shall at all time be in good working order and comply with the regulations of the countries in which the vessel can be employed, loaded and discharged under this charter party (including I.L.O convention Number 32 which statutory in the U.S.A. under Public Law 85-742, Part 9 – Safety and Health Regulations for longshoring, the United Kingdom Factory and Workshop Act)  and Owners are to ensure that the vessel is at all time in possession of valid and up to date certificate of efficiency to comply with such regulations.

If stevedores, longshoremen or other workmen are not permitted to work due to failure of Master and/or Owners' agents to comply with the aforementioned regulations, or because the vessel is not in possession of such valid and up to date certificate of efficiency, any delay therefrom shall be for Owners' account and Owners to pay all extra expenses incurred incidental to and resulting from such failure and hire shall cease until vessel is in a position to comply with aforementioned regulations.

37. If the vessel is delayed or rendered in-operative by any  reason including strike in connection with Officers or crew, such time lost to be off-hire and any expenses thereby incurred  to be for Owners' account. Owners to pay cost of any delays, expenses or fines incurred on account of smuggling or carriage of contraband by vessel's Officers or crew.

38. Should the vessel deviate or put back whilst on her voyage by reason of an accident or by reason of any provision in  this charter party according to which payment of hire shall cease to run, the hire shall be suspended from  the time of her putting back or deviating until she is again in  the same or equidistant position as requested by the Charterers and  the voyage resumed therefrom.

39. In the event of breakdown of a crane(s), or other equipment belonging to the Owners necessary for loading and unloading of the vessel for any period by reason of disablement or insufficient power, the hire to be reduced pro rata for the period of such inefficiency in relation to the number of cranes or equipment still usable and Owners to pay for any expenses including stevedore standby time caused by such failure. If Charterers elect to continue work by shore appliances, the Owners are to reimburse the Charterers to  the extent of any loss or extra expense incurred by such breakdown  including rent of shore and/or floating cranes, but in such case vessel to  remain on hire.

40. On delivery (or at first loading port) and prior redelivery Charterers have the option to perform an on-hire/off hire survey and/or a bunker survey. Should there by any dispute with regard to bunker quantities Charterers will appoint an approved independent surveyor (SGS) surveyor, or similar if available to verify together with Charterers' representative and vessel's Chief Engineer actual bunker quantities on board. Cost of survey to be shared equally between Owners and Charterers. Surveyors to have full access to vessel's deck and engine log books. Charterers have the right to perform a bunker survey at any time during this time charter and Master/Chief Engineer will give Charterers any assistance required.

4

**ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE M/V "SUMY"**
**DATED PARIS 29ᵗʰ JUNE 2007**

41. Trading exclusions :

Worldwide trading always within IWL, excluding :
Angola, Cabinda, Namibia, Liberia, Nigeria, Israel, Iraq, Turkish part of Cyprus, USA, Canada, Yugoslavia, Syria, Sweden, Finland, Norway, direct trading between China and Taiwan, Australia, New Zealand, North Korea and war zones –
as to war exclusions to be as per London Hull and P. & I. War Risks Underwriters current exclusion list being in force. Charterers have no right to operate the vessel within war risks zones without having Owners confirmation/permission in writing and paying additional premium in accordance with rate and terms set out by London Underwiters.

42. War Risk Insurance :
Additional premium for breach of war risk trading warranty of the vessel's war risk policy by virtue of the vessel's trading in an excepted or restricted area to be for account of the Charterers who will pay against production of the original invoices of the Association Owners. The vessel is entered with the Association for a total value of USD 3.000.000,-.

43. Notwithstanding anything in this charter party to the contrary it is expressly agreed that the Owners remain responsible for all personal injury claims arising from Owners' negligence to the extent of a full Owners' P and I cover and the Owners guarantee to maintain such P. & I. cover for duration of this charter party, except of Charterers' auspices.

Charterers to have the benefit of any return insurance premium receivable by Owners from their Underwriters, as and when received from their Underwriters, by reason of the vessel being in port for a minimum period of 30 days, provided vessel is on hire during the same period.

Vessel's Protective and Indemnity insurance is provided by The British Marine Luxembourg S.A.

44. All claims to be settled according to the Interclub New-York Produce Exchange agreement as amended 1996 and any subsequent amendments thereof and as accepted by the London Group of P and I Underwriters and with the wording said formula had at the date of this charter party.

Charterers' P and I Club to be RAETS Club.

45. Charterers shall have the option to break Institute Warranty Limits subject to Owners' prior approval which not to be unreasonably withheld, against payment of any additional extra insurance premium charged by Owners' Underwriters against original vouchers. Such extra insurance premium not to exceed what is quoted by Lloyd's of London.

46. Deleted.

47. Ballasting of the vessel :
If practicable the Master during loading and discharging to ballast vessel to the extent required by stevedores in order to ensure that the booms of the shore cranes have easy access to the vessel's hold.

48. Deleted.

49. Deleted.

50. The stevedores to be appointed and paid for by Charterers, Shippers or Receivers or their agents and to remain under the direction and control of the Master.

Charterers not to be held responsible for any damage to the vessel incurred during loading and discharging operations unless the Master advises Charterers of such damage by telex or fax as soon as possible but within a maximum of 24 hours.

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE  M/V "SUMY" DATED PARIS 29th JUNE  2007

50. Continued…

Master also to give notice to both Charterers' agents and the party causing damage within a maximum of 24 hours and to use his best endeavours to obtain the admission of liability of the party causing damage and have the damage repaired by this party. Stevedores damage affecting seaworthiness of the vessel to be repaired immediately by the party causing such damage. However should such party fail to repair same, Charterers to remain ultimately responsible to repair such damage prior to vessel's sailing from port where such damage occurs.

Copies of the correspondence together with the Original letter acknowledging liability, if obtained, to be sent to Charterers as soon as possible, but in any event within 30 days of the damage occurring. Provided Owners and/or the Master comply with the requirement in this clause, Charterers will remain ultimately responsible for any damage caused.

51. Charterers' authorization to sign Bills of Lading:
With reference to lines 78/79 of this charter party, if requested by Charterers or their agents Master to authorize Charterers and/or their agents to sign on Master's  and/or Owners ' behalf all Bills of Lading as presented in accordance with Mate's receipts without prejudice to this charter party. Drafts of Bill(s) of Lading should be approved by Owners within reasonable time prior signing.

52. Deleted.

53. Deleted.

54. Charterers have the right to use vessel's wireless installation for sending and receiving of telegrams.
The Master to instruct Radio Officer to listen for messages from Charterers.
Charterers to pay to Owners a lumpsum of USD 1.100,00 per month/prorata for cable/victualling/ entertainment.

55. The vessel to fly Charterers' house flag, if required. Charterers have the option of painting the vessel's funnel with their own markings, provided same is repainted with Owners' colours before redelivery, the cost being for Charterers' account.

56. Master to send Charterers from each port of call deck and engine log abstracts, duly translated in English language, covering voyage and port time.

57. Owners warrant vessel's hatchcovers are watertight. Charterers are entitled to carry out hose test prior commencement of loading as per clause 86.

58. Evidence of receipt of hire payment by the bank shall constitute compliance of Charterers' obligation to pay hire in accordance with Clause 5 whether Owners are so notified by the bank or not. Referring to lines 60 and 61 where there is any failure to make punctual and regular payment due to oversight, negligence or error of Charterers' bank or agents, Owners shall give Charterers two additional banking days written notice in order to rectify the failure. Where so rectified that payment stand as punctual and regular payment.

Owners' bank for remittance :

| | |
|---|---|
| BENEFICIARY NAME | : ARDEMAR MARINE LIMITED |
| BENEFICIARY'S ADDRESS | : 24A, ARCHIMIDOUS STREET, |
| | ENGOMI, NICOSIA 2411,  CYPRUS |
| BANK BENEFICIARY | : MARFIN POPULAR BANK PUBLIC CO LTD, NICOSIA, CYPRUS |
| SWIFT CODE | : LIKICY2NXXX |
| ACCOUNT NO. (USD) | : CY23 0030 0178 0000 0178 3311 1625 |
| CORRESPONDENT BANK | : JP MORGAN CHASE NEW YORK, NY USA |
| CORRESP. ACCOUNT NO | : 001-1-190-683 |
| SWIFT CODE | : CHASUS3 |

6

**ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE M/V "SUMY"
DATED PARIS 29th JUNE 2007**

59. Should the vessel be on her voyage towards the port of redelivery at the time when payment of hire is due, said payment shall be made for such length of time as Owners or their agents and Charterers or their agency may agree upon as the established time necessary to complete this voyage. Charterers have the right to deduct reasonably estimated disbursements for Owners' account from hire payment and any difference shall be refunded by Owners or paid by Charterers, as the case may be.

60. Should the vessel be arrested, seized, detained or held during the currency of this charter party at the suit of any party (including port authorities) having or purporting to have a proven claim against or any interest in the vessel, unless failure of the Charterers or their servants, hire under this charter party shall not be payable in respect of any period during which the vessel is not fully at Charterers' disposal and any consequential expenses resulting from same which Charterers may incur, to be for Owners' account, otherwise vessel to remain on hire.

61. Crew services :
Hire to include following services from crew provided same permitted by port authorities :
    1)  docking and undocking
    2)  shifting and warping the ship during loading and/or discharging alongside
    3)  bunkering
    4)  raising and lowering derricks or rigging cranes and preparation for loading and discharging
    5)  opening and closing of hatches in preparation for and during the loading and/or discharging
    6)  removing and replacing beams in preparation of loading and/or discharging
    7)  deleted
    8)  deleted
    9)  deleted
    10) maintaining steam/power while loading and/or discharging and care of cranes
    11) deleted
    12) supervision of loading and/or discharging
    13) deleted
    14) it is understood that certain of the above services may be prohibited by shore labour regulations in which case the Master will comply with such regulations but will use his best diligence to perform some of the services at sea, whenever possible.
    15) deleted.

62. Charterers to have the option to redeliver the vessel clean swept or to pay to Owners in lieu of holds cleaning on redelivery a bonus of USD 3.250,00 including removal.

63. Notice Delivery :
Owners to give notice on fixing and daily notices of ETA at loading port to Novel Commodities S.A., Geneva telex : +45-412057/email : freight@novelcommodities.ch and agents at loading port.

64. Protective Clauses :
The Both To Blame Collision Clause, New Jason Clause, Baltime 1939 (a/b/c/d/e/f) War Clauses, General Clause Paramount incorporating Hague Rules as attached, are deemed to be incorporated in this charter party and in all Bills of Lading under this charter party, where applicable.

65. Bunkers Clause :
Bunkers on delivery to be  about 350 metric tons IFO and about 55 metric tons MDO.
Bunkers on redelivery to be about the same as on delivery.

Prices at both ends : USD 400,00 per MT IFO and USD 700,00 per MT MDO

Owners have the right to bunker the vessel for their account as long as it does not interfere with Charterers' bunkering/cargo plan.

Charterers have the option to bunker in South Africa, in which case Owners authorize Charterers to use RMF 25 to usual South African standards instead of RME 25.

66. Deleted.

**ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE M/V "SUMY"**
**DATED PARIS 29th JUNE 2007**

67. Charterers' agents to attend to vessel's normal requirements without charging agency fees- for extra attendance such as major repairs/crew changes etc.. agents have the liberty to charge agency fee as per official tariff.

68. Deleted

69. No deduction from hire for domestic consumption.

70. Deleted

71. Fixture to be kept strictly private and confidential.

72. Deleted.

73. Cargo exclusions :
Vessel to carry harmless lawful cargoes except :
LOGS, CHEMICAL WASTE, ASPHALT, PITCH IN BULK, EXPELLERS, BITUMEN IN BULK, BORAX IN BULK, CALCIUM CARBIDE, HIDES, CHARCOAL, RESIN IN BULK, COPRA, EXPLOSIVES, LIVESTOCK OF ANY DESCRIPTION, ACIDS, DANGEROUS AND/OR INJURIES AND/OR INFLABLE CARGOES, ARMS, AMMUNITION, NUCLEAR AND/OR RADIOACTIVE MATERIALS AND/OR ITS WASTE, DIRECT REDUCED IRON OR PELLETS, HOT BRIQUETTE IRON, NAPHTHA, FERROSILICON, MOTOR SPIRIT, TURPENTINE, CALCIUM HYDROZIDEANED, ANY OTHER HARMFUL, DANGEROUS, INJURIOUS, CONTRABAND OR UNLAWFUL CARGOES, SPONGE IRON, SULPHUR, COPRA, SALT IN BULK, PETROLEUM COKE, CHARCOAL IN GUNNY BAGS, TAR IN BULK, SALTPETER, CALCIUM HYPOHLORIDE, JUTE IN BULK, LIME, ASBESTOS IN BULK, AMMONIUM NITRATE, ARMS, AMMUNITIONS, EXPLOSIVES, SUNFLOWER SEED EXPELLERS, HIDES, FIRE BRISKETS, PETROLEUM PRODUCTS AND ALL ITS DERIVATIVES, CONCENTRATES, MANIOC, SCRAP INCLUDING MBT AND OILY SCRAP, CONTAINERS WITH DANGEROUS CARGOES, DANGEROUS AND INFLAMMABLE CARGOES INCLUDING RADIOACTIVE, TURNINGS, SHAVINGS AND HEAVY/OILY PARTS, CREOSOTED GOODS, CEMENT IN BULK.
CHARTERERS MAY BE ALLOWED TO CARRY DANGEROUS CARGOES IN ACCORDANCE WITH IMO DANGEROUS GOODS CODE PROVIDED OWNERS AND MASTER'S APPROVAL IS GIVEN AND LOADING/DISCHARGING IS ALWAYS IN ACCORDANCE WITH IMO AND LOCAL REGULATIONS AND TO MASTER'S SATISFACTION. ANY EXTRA PREMIUM FOR DANGEROUS CARGO TO BE BORN BY CHARTERERS AND OWNERS TO BE PUT IN FUNDS UPON PRESENTATION OF UNDERWRITERS VOUCHERS TO CHARTERERS.

74. In case of need to specify the port of destination on Bill(s) of Lading (i.e. if initial Bill(s) of Lading show destination "1/2/3 African ports" or "1/2/3 West African ports" or equivalent) and/or in case the distribution of quantities shown in the initial set of Bills of Lading would be different to the actual distribution of quantities, Charterers or their agents to have the right to specify in the face of the Bills of Lading the precise destination once declared in which case on new set(s) of Bills of Lading will be issued, or to issue and/or split in Paris (Lerbret & Cie S.A.S) and sign on Master's behalf new set(s) of Bills of lading under the following formal conditions :

a) Total quantity and description of cargo and remarks if any to be fully in accordance with the initial Bill of Lading.
In case of specification of port of destination Owners will be approached by Charterers with relevant request supported with relevant L.O.I. signed by Charterers only.

b) New set(s) of Bills of Lading and any subsequent amendments to be faxed to the Owners for approval before releasing same, but Owners not to unreasonably withhold/delay their approval.
The initial complete set of original Bills of Lading to be surrendered, stamped "cancelled" and returned to the Owners. New set of Bill(s) of Lading to be released upon receipt by Owners by fax of copies of old Bill(s) of Lading duly stamped "cancelled" as well as of airway bill number of courier of old cancelled Bill(s) of Lading. Charterers to fax to Owners also the initial Bill(s) of Lading in order Owners compare same with the new one(s).

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE M/V "SUMY" DATED PARIS 29th JUNE 2007

74. Continued…

c) Charterers hereby undertake and guarantee to hold Owners and/or Master harmless from any liability arising therefrom and to indemnify Owners for all costs and consequences as a result of Charterers acting within the above mentioned authority.

Should Originals Bills of Lading not be available on vessel's arrival at discharging port(s) during the currency of the charter, Owners/Master to discharge and release cargo without presentation of Original bills of Lading against Owners' standard P. & I. Club Letter of Indemnity signed by Charterers' authorized person only.

74. Continued …

One original Bill of Lading accomplished makes the 2 (two) other null and void and Charterers' responsibility against a Letter of Indemnity (for discharging against non availability of original Bill of Lading at discharging port), to cease on surrender of 1 (one) original Bill of Lading (related to such Letter of Indemnity) duly accomplished.

75. Deleted.

76. Deleted.

77. In case vessel is coming off-hire for more than 5 days, Charterers have the option to cancel balance of time charter period provided vessel is empty of cargo.

78. BIMCO Double Banking Clause as below to apply (but it is understood that in any case customary loading/discharging in safe anchorages not to be considered as double banking) :

a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d) The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

79. If deck cargo such to be at Charterers' sole risk/responsibility and relevant Bills of Lading to be claused accordingly. Deck cargo, if any, to be loaded/stowed/lashed and secured to Master's satisfaction.

80. In case of loading finished steels or other finished products including bagged cargo, Charterers have the option to arrange for a joint pre-shipment condition survey and/or sealing of hatches with costs to be shared equally between Owners and Charterers. Copy reports being made available to both parties.

81. Arbitration as per LMAA FALCA Clause including short claims procedure for claims unexceeding USD 50.000 with 12 months time bar, as attached.

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE M/V "SUMY" DATED PARIS 29th JUNE 2007

82. Owners' option to use gas oil in main engine for manoeuvring in/out of narrow waters/canals etc...

83. In the event of the vessel being denied or restricted in the use of the port and/or loading/discharging or shore labour and/or tug and/or pilotage assistance or being boycotted or delayed or rendered inoperative by strikes, labour stoppages, or by any other difficulties due to vessel's flag, ownership, crew, terms of employment of Officers or crew of this or any other vessel under the same ownership, operation or control or because of previous trading of this vessel or any other vessel as aforesaid, hire shall cease for the time thereby lost and any directly related expenses and liabilities incurred thereby to be for Owners' account.

84. Lien :
In the event that Charterers have a contractual or statutory right of lien over cargo carried on board for hire, freight, deadfreight or demurrage Owners shall co-operate with Charterers in exercising a lien over the cargo and shall retain possession of the cargo on their behalf and deal with the cargo on Charterers' instructions.

84. Vessel to load only cargo for which clean and unclaused Mate's receipts and Bills of Lading can be issued. In order to be able to do so, the Master has the right to reject damaged or stained or torn cargo/bags and respective cargo/bags to be replaced by sound cargo/bags.

85. Charterers designated underwriters' local representative to be allowed to board the vessel with a view to carrying out a pre-inspection/condition survey including a hose test survey prior loading.
In the event that vessel fails the pre-inspection/condition survey, then Charterers shall have the option of cancelling this charter party, without any Charterers' liability whatsoever. However if vessel passes her pre-inspection/condition survey but only fails the hose test survey then Owners to immediately arrange necessary repairs. Time consumed and expenses for such operations to be for Owners' account and vessel to be placed off-hire form the time she is rejected until she has passed same. Should vessel fail to any subsequent test, up to maximum 2 additional tests, then Charterers shall have the option of cancelling this charter party without any Charterers' liability whatsoever.

****************************

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE M/V "SUMY" DATED PARIS 29th JUNE 2007

**QUESTIONNAIRE**
**(to form part of the charter party)**

**M/V "SUMY"**

| | |
|---|---|
| Ex name | : IKAN BELANAK |
| Call sign | : UVYH |
| Port of registry | : MARIUPOL, UKRAINE |
| Head Owners | : COMMERCIAL FLEET OF DONBASS LLC |
| Disponent Owners | : BAREBOAT CHARTERERS ARDEMAR MARINE LIMITED |
| Managers | : CFD SHIPPING LTD |
| Vessel's type | : bulk carrier |
| Official registry number | : 26 |
| Date of build/builder | : 11.1978 |
| GRT/NRT: | |
| International | : 14136 / 7973 |
| Panama | : 15540 / 11264 |
| Suez | : 15268,8 / 12357,56 |
| Light weight | : 5870 |
| DWT/draft: | |
| Summer | : 22904 / 9.942m |
| Winter | : 22249 / 9.735 |
| Tropical | : 23562 / 10.149 |
| Fresh water | : 22906 / 10.169 |
| Timber summer | : |
| Air draft | : 41.24m |
| Tpc | : 31.68 |
| Summer draft | : 9.735m |
| Length  (loa) | : 164.59m |
| (lpp) | : 156.00 |
| Breadth (moulded) | : 22.86 |
| Depth (moulded) | : 13.70 |
| Constants | : about 200 mts |
| Classification | : |
| Class/no | : 782878 |
| IMO number | : 7701691 |
| Character(s) of class | : RUSSIAN MARITIME REGISTRY OF SHIPPING KM BULK CARRIER (ESP) |
| Insurance | : |
| Hull + Machinery (policy number) | : 2181430 |
| (name of assured) | : ARDEMAR MARINE LTD |
| Co-assured | : Commercial Fleet of Donbass Ltd + CFD Shipping Ltd International Shipping Co |
| (value/deductible) | : USD 3 000 000.- / 60 000 US USD |
| (leader of underwriter) | : ASKA |
| Reinsurer | : INGOSSTRAKH, MOSCOW |
| P I Club/number | : BRITISH MARINE LUXEMBOURG, NO 00048000001 |
| Last special survey | : 16.04.2004 |
| Next special survey | : 16.04.2009 |
| Last dry docking | : 02.05.2007 |
| Navigation equipment | : 16.04.2009 |
| Engine | : |
| Type   number of main engine | : 1 X DIESEL |
| Rated power of main engine | : DESIGNED MCR BHP: 8300 /6108 KW |
| Type   number of generator | : 3 X DIESEL |
| Rated power, voltage | : 3 X 460 KWT / 450 V / 60 HZ |

11

**ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE  M/V "SUMY"
DATED PARIS 29th JUNE  2007**

| | |
|---|---|
| Consumption | : |
| Bunkers type | : IFO-180 RME 25 |
| Sailing consumption | : 21 mt/day |
| Port consumption basis idle | : 1.5MT MDO+ 1 MT IFO IF USED BOILER mt/day |
| basis working | : 2.0MT MDO+ 1 MT IFO IF USED BOILER mt/day |
| Speed | : |
| Laden | : 12.5 KNOTS |
| full ballast | : 12.5 KNOTS |
| (working basis on 4 holds) derricks | |
| Derricks 4 x 25 mt | : 2.0MT MDO+1 MT IFO IF USED BOILER |
| Strength | : |
| Hatch cover | : 1.84 T/M2 |
| Main deck of hatch | |
| Tanktop | : 1,2,4 - 13.18 T/M2, 3 - 14.37 MTS |
| Capacities | : |
| Fuel oil tank capacity | : ABOUT 1130 MTS |
| Diesel oil tank capacity | : ABOUT 100 MTS |
| Ballast tank capacity | : 11 690 cbm |
| Fresh water tank capacity | : 302 cbm |
| Hatches and covers | : |
| Number of holds/hatches | : 4 / 4 |
| Type of hatch cover | : MACGREGOR ROLLER |

Hatch covers dimensions ( l x b):

| HOLD  NO | 1 | 12.8 X  9.2 |
|---|---|---|
| | 2 | 27.2 X 11.4 |
| | 3 | 13.6 X 11.4 |
| | 4 | 27.2 X 11.4 |

Holdwise grain/bale capacity:

| | CBM. | GRAIN / BALE |
|---|---|---|
| HOLD NO | 1 | 3889 /  3703 |
| | 2 | 10277 / 10057 |
| | 3 | 4971 /  4956 |
| | 4 | 9901 /  9688 |
| | Total | 29038 / 28404 |

Owners' reply to Charterers' questionnaire / warranties:

A)
Owners warrant that the vessel is highest classed with a member of I.A.C.S. and to remain this way for the duration of the Charter-Party and class papers are free from recommendations. - CONFIRM

B)
Owners warrant that the vessel is fully covered with a P I Club for the duration of this Charter-Party and same to be a member of the International Group of P I Clubs:
Owners' P I Club: BRITISH MARINE LUXEMBOURG

C)
Owners warrant that the vessel is fully insured for Hull and Machinery Risks and is insured with ASKA and re-insured INGOSSTRAKH for the value of US USD 3 000 000.-

D)
ISM Clause:
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter- Party, the Owners shall procure that the vessel and  The Company  (as defined by the ISM Code) shall comply with the requirement of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE M/V "SUMY" DATED PARIS 29th JUNE 2007

Charter-Party any loss, damage, expense or delay whatsoever caused by failure on the part of the Owners or The Company to comply with the ISM Code shall be for the Owners' account.

Owners confirm that vessel is not blacklisted by the Secretariat of Paris Memorandum of Understanding on Port State Control.

Vessel is fully ITF covered.

E)
Owners confirm vessel has not called C.I.S. Pacific port(s) between 40 and 60 degrees North between July and September in last two years. CONFIRM

F)
Vessel has flat steel tanktops and is a selftrimming bulkcarrier suitable for grab discharge with no stanchions or other obstacles hindering or delaying the loading or discharging by grabs. CONFIRM

G)
Charterers' option to use forklifts/bulldozers with rubber tyres/tracks but always in accordance with vessel's tanktop strengths. CONFIRM

H)
Vessel is fully grain fitted in accordance with Chapter IV of SOLAS 1974 without requiring any bagging/strapping/securing. CONFIRM

I)
Any average last 12 months                          : NO
Nationality of Master/Officers/crew                 : ALL UKRAINIAN
Call sign: UVYH / telex number                      : INMARSAT-C 427286710
Other vessel's controlled by Owners/managers : SEE WWW.CFD.COM.UA

J)
Name and P. & I. of carrier to appear on Bill(s) of Lading:
ARDEMAR MARINE LIMITED, NICOSIA, CYPRUS
P. & I. BRITISH MARINE LUXEMBOURG

***************************

13

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE M/V "SUMY" DATED PARIS 29th JUNE 2007

## LMAA FALCA Clause + 12 months time bar

"This contract is governed by English Law and all disputes arising under or in connection with it shall be referred to arbitration in London. The arbitration shall be conducted in accordance with one of the following LMAA procedures:

i) where the amount claimed by the claimants is less than US$ ............ (note: where no figure is inserted, the parties shall be deemed to have agreed a limit of US$ 250.000,00, excluding interest), excluding interest, the reference shall be to a sole arbitrator and the arbitration shall be conducted in accordance with the LMAA FALCA Rules;

ii) where the amount claimed by the claimants is less than US$ 50.000,00 (fifty thousand US Dollars), excluding interest (or such other sum as the parties may agree) the reference shall be to a sole arbitrator and the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure;

iii) in any case where the LMAA procedures referred to above do not apply, the reference shall be to three arbitrators (one to be appointed by each of the parties and the third by the arbitrators so chosen) in accordance with the LMAA terms in force at the relevant time.

#### Time bar:
Disputes shall be referred to arbitration latest twelve months after completion of discharge, failing which such submission shall be time barred and shall be considered as null and void."

## Both-to-Blame Collision Clause

"If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying Vessel or Carrier. The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."

## New Jason Clause

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible by statute, contract or otherwise, the goods, Shippers, Consignees or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or owners of the goods to the Carrier before delivery."

14

**ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE  M/V "SUMY"
DATED PARIS 29th JUNE  2007**

## Paramount Clause General

"The International Convention for the Unification of certain Rules of Law relating to Bills of Lading, signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment, shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.

Where there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment, or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract.
The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatory or by this Contract.

The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier, or with respect to deck cargo and live animals."

## Baltic Conference War Risks Clause for Time Charters, 1939

**(Code Name: "CONWARTIME")**

(A)　　The Vessel, unless the consent of the Owners be first obtained, not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war, hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or State whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent powers or parties or by any Government or Ruler.

(B)　　Should the vessel approach or be brought or ordered within such a zone, or be exposed in any way to said risks (1) the Owners to be entitled from time to time to insure their interests in the Vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) hire to be paid for all time lost including any lost owing to loss of or injury to the Master, Officers or Crew or to the action of the Crew in refusing to proceed to such zone or to be exposed to such risks.

(C)　　In the event of the wages of the Master, Officers and/or Crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly.

(D)　　The Vessel to have the liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the Vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or directions.

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF THE  M/V "SUMY" DATED PARIS 29th JUNE  2007

(E)     In the event of the nation under whose flag the Vessel sails becoming involved in war, hostilities, warlike operations, revolution or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the Vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of section (A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo on board.

(F)     If in compliance with the provisions of this Clause anything is done or not done, such not to be deemed a deviation.

Note: Delete Section (C) unless specifically agreed.

*************************

EXHIBIT "B"

From:      "CFD / Pavlov" <Pavlov@cfdshipping.com>
To:        <kld@cfdshipping.com>
Sent:      27 September 2007 13:13
Subject:   FW: m/v Sumy

From: 427286712@stratosmobile.net [mailto:427286712@stratosmobile.net]
Sent: Sunday, July 29, 2007 8:23 AM
To: common@cfd.com.ua
Subject: Fm: m/v Sumy

TO: JAVEE@WALLEM.CO.TH
cc: burachai.kanlayasiriyat@novelcommodities.ch
cc: common@cfd.com.ua
Fm: m/v Sumy
subject: letter-protest

GD,
Dear Sirs,
Kindly ask you to pass the following letter of protest to Stevedoring
Co.

For passing to Stevedoring Co.

                 Letter of Protest

Dear Sirs,

     This is to inform You that on July 28,2007 at 21:30 LT due to
inefficient work of the crane man of crane No.2 a rope of the derrick
was torn off.In result of that the derrick of crane No.2 fell down on
crane No.3 and damaged the ropes of the derrick and cargo ropes of
crane No.3 that led to precipice of these ropes and the derrick of
crane No.3 fell down on the starboard side bulwark and the barge
fasted to the ship from starboard side brushed against the canopy of
this barge.As You know we repeatedly notified You orally about ineffi
cient work of Your crane men (three movements simultaniously: lifting
up of a derrick,lifting up of a hook and turning of a derrick),and on
22.07.07 we handed to You a corresponding letter regarding negligent
and incorrect work of Your crane men.
     On basis of above-mentioned we are,therefore,holding the Steve
doring Co. responsible for the damages of cranes No.2 and No.3, for
all expenses caused by repairs of the crane and substitution of the
ropes for new ones and also for all probable claims of the Charterer
concerning dead freight and delay of the vessel according to the
repairs of cranes No.2 and No.3 and for all other consequences which
may arise there from.
     We trust to get an early reply.

Faithfully Yours,
The master of the m/v"Sumy"
Volodymyr Grytsayenko

pls,confirm receiving and passing of th

28/09/2007

EXHIBIT "C"

Page 1 of 3

# TAX INVOICE
(CO REG. NO: 199700913E)
(GST REG. No. : 19-9700913-E)

TO: The Master & Owners of M/V " SUMY "
c/o Commercial Fleet of Donbass, LLC
Lunina Avenue ,39, Mariupol 87510
Ukraine

Attn : Accounts Dept

| | |
|---|---|
| INVOICE NO: | 27353 |
| YOUR ORDER NO: | NA |
| OUR REF NO: | 7-159 |
| PAYMENT TERMS: | Immediate |
| DATE: | 30 August 2007 |

| ITEM NO. | DESCRIPTION | AMOUNT |
|---|---|---|

VESSEL NAME : M/V "SUMY"

M/V "Sumy"

1  Furnished supervisor, skilled fitters and qualified riggers to remove/dismantle the damaged No.3 crane jib and       $24,975.00
platform from the ship for repair while vessel anchored at Singapore in-port-limit anchorage from 6 Aug 2007.
(See SGQT-07-0301)

| S/N | Date | Day | Category | No. of Men | Working Hours | | NT x 1.0 | O/T x 1.5 | O/T x 2.0 | Accounted Hours | Basic Unit Rate | Sub-Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | From | To | | | | | | |
| 1 | 06/08/2007 | Wed | Supervisor | 1 | 0800 | 2200 | 8 | 6 | 0 | 15.5 | $60 | $930.00 |
| 2 | 06/08/2007 | Wed | Fitter/Rigger | 6 | 0800 | 2200 | 8 | 6 | 0 | 15.5 | $30 | $2,790.00 |
| 3 | 06/08/2007 | Thu | Supervisor | 1 | 0800 | 2200 | 0 | 0 | 13 | 26.0 | $60 | $1,560.00 |
| 4 | 06/08/2007 | Thu | Fitter/Rigger | 6 | 0800 | 2200 | 0 | 0 | 13 | 26.0 | $30 | $4,680.00 |
| 5 | 29/08/2007 | Wed | Supervisor | 1 | 0800 | 0800 | 8 | 7 | 8 | 34.5 | $60 | $2,070.00 |
| 6 | 29/08/2007 | Wed | Fitter/Rigger | 9 | 0800 | 0800 | 8 | 7 | 8 | 34.5 | $30 | $9,315.00 |
| 7 | 30/08/2007 | Thu | Supervisor | 1 | 0800 | 1900 | 8 | 2 | 0 | 11.0 | $60 | $660.00 |
| 8 | 30/08/2007 | Thu | Fitter/Rigger | 9 | 0800 | 1900 | 8 | 2 | 0 | 11.0 | $30 | $2,970.00 |

Note : 9 Aug 2007 is a public holiday.

2  Provided one (1) unit of flat top barge c/w tug boats for transportation of crane jib & platform.
(See SGQT-07-0301)
Total:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 06-08-2007 (Wed) | x | 1 | unit | @ | $8,600.00 | /set/day | x | 1.0  O/T surcharge | $8,600.00 |
| 09-08-2007 (Thu) # | x | 1 | unit | @ | $8,600.00 | /set/day | x | 1.5  O/T surcharge | $12,900.00 |

3  Furnished labour & material to fabricate new crane jib for No.3 crane as per sample and owner-approved drawings.       $160,000.00
(See SGQT-07-0301)
Size of Crane Jib : Approx. 25000L x 12.5ton x 1 off

Steel Material : ABS Grade 'EH36' or equivalent

E.&.O.E
A/C No: 041-788915-001

Bank : The Hong Kong and Shanghai Corporation Ltd, Singapore
Bank/Branch Code : 7232 / 041

Swift Code: HSBCSGSG

New steel material was preblasted to SA2.5 & applied with one coat of shop primer.    Incl.
Burnt/disturbed paint after hot-work was power-brushed and applied with one touch-up coat.    Incl.

Applied 2 finishing coats upon completion.  Paint material shall be supplied by owners.    Incl.

Additional (See SGQT-07-0301-3)
Supplied intermediate & top coat paint materials for the No.3 crane jib    $980.00

Krem Buff color @ $12.00/Ltr    Incl.
Total Qty: 80 Ltrs

Carry out 100% visual inspection on all weldments, 10% MPI on weldments, and 100% UT on butt welds.    Incl.

Additional (See SGQT-07-0301-1)
Being overtime charge as per agreement.    $48,000.00

4    Arranged ferry boats for mobilization of repair team.

Total:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 08-08-2007 (Wed) | 1 | Trip | x | $160 | / Trip | x | 1.00 | rate | $160.00 |
| 08-08-2007 (Wed) | 1 | Trip | x | $160 | / Trip | x | 1.50 | rate | $240.00 |
| 09-08-2007 (Thu)* Holiday | 3 | Trip | x | $160 | / Trip | x | 1.50 | rate | $720.00 |
| 29-08-2007 (Wed) | 1 | Trip | x | $160 | / Trip | x | 1.50 | rate | $240.00 |
| 30-08-2007 (Thu) | 1 | Trip | x | $160 | / Trip | x | 1.00 | rate | $160.00 |
| 30-08-2007 (Thu) | 1 | Trip | x | $160 | / Trip | x | 1.50 | rate | $240.00 |

5    Furnished cargo boat service for transportation of tools and equipment

Total:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 08-08-2007 (Wed) | 1 | Trip | x | $1,200 | / Trip | x | 1.00 | rate | $1,200.00 |
| 09-08-2007 (Thu)* Holiday | 1 | Trip | x | $1,200 | / Trip | x | 1.50 | rate | $1,800.00 |
| 30-08-2007 (Wed) | 1 | Trip | x | $1,200 | / Trip | x | 1.50 | rate | $1,800.00 |
| 30-08-2007 (Wed) | 1 | Trip | x | $1,200 | / Trip | x | 1.00 | rate | $1,200.00 |

6    Arranged shore crane service at Pasir Panjang Lighter Wharves for the loading/unloading of equipment.

| Total: | $100 | x | 5 | lifts | $500.00 |
|---|---|---|---|---|---|
| | $100 | x | 6 | lifts | $600.00 |

7    Arranged floating crane c/w tugs for the lifting of the crane jib No.3 due to inability of ship to use the existing cranes
for offloading of jib
(See SGQT-07-0301-1)

Total:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 09-08-2007 (Thu) | 1 | unit | x | $35,000 | /day | x | 1.5 | rate | $52,500.00 |
| 29-08-2007 (Wed) | 1 | unit | x | $35,000 | /day | x | 1.0 | rate | $35,000.00 |
| 30-08-2007 (Thu) | 1 | unit | x | $35,000 | /day | x | 1.0 | rate | $35,000.00 |

8    The existing sheave block has been dismantled and overhauled.  The bearings and shafts found  be scored and    $2,380.00
worn. Supplied new material and renewed.
Total:
Bearing (20034B) x 7 pcs @ S$130/pc

E.& O.E    Bank : The Hong Kong and Shanghai Corporation Ltd, Singapore
A/C No: 041-788815-001    Bank/Branch Code : 7232 / 041
    Swift Code: HSBCSGSG

SINGATAC ENGINEERING

Shaft (AISI 4140) Dia 105 x 520L x 1 pc @ $600/pc
Shaft (AISI 4140) Dia 105 x 657L x 1 pc @ $660/pc

ADDITIONAL
Upon opening up the sheave block, found total 14 bearings inside.
Total: Bearing (23024E) x 7 pcs @ S$160/pc                           $1,120.00

9    Cargo Block

Carried out overhauling as per owners' order.                        $1,200.00

Carried out material identification on external block body and shaft by accredited laboratory.   $1,500.00

Carried out renewal of the external block body and shaft.  Sheave, hook and shackles were reused.   $3,800.00

Performed load testing up to maximum SWL x 1.5 as per surveyor's requirement.  Issued test certificate upon    $5,000.00
completion.

ADDITIONAL
Following items to be renewed.
Total:
Shackle, 55-ton x 1 pc                                               $880.00
Shackle, 42.5-ton x 1 pc                                             S$570.00
End Link U2 64dia, 40-ton  x 1 pc                                    $700.00
Bearing (23024E) x 2 pcs @ S$160/pc                                  $320.00

10   Load Testing of No.3 Crane Jib                                  $5,800.00

Arranged load testing up to maximum SWL 25 ton x 1.5 time as per surveyor requirement using water bag.

| | |
|---|---|
| GRAND TOTAL : | S 410,465.00 |
| LESS 1ST INSTALMENT PAID : | -S  72,992.00 |
| LESS 2ND INSTALMENT PAID : | -S 290,908.50 |
| BALANCE AMOUNT DUE : | S  45,564.50 |

SINGATAC ENGINEERING PTE LTD

_____
Authorised Signature

*(Singapore Dollars : Forty Five Thousand Five Hundred Sixty Four And Cents Fifty Only)*

E. & O.E                Bank : The Hong Kong and Shanghai Corporation Ltd, Singapore
A/C No: 041-788915-001   Bank/Branch Code : 7232 / 041
                                                        Swift Code: HSBCSGSG



# INTERMARINE SUPPLY CO. (PTE) LTD.

NO.12, TUAS AVENUE 11, JURONG, SINGAPORE 639078.
TEL: (65) 6868 9988 (10 LINES) TELEX: RS 24328 IMCCO
FAX: (65) 6868 3277/ (65) 6868 3177
GROUP GST REG. NO.: MR-8500367-9
WEBSITE: http://www.intermarine.com.sg
E-mail: ropes@intermarine.com.sg
Business Regn No: 197401537N





**CASH SALE**

**No. 09947**

Messrs ___CFD Shipping Ltd___

___MV "Sunny"___

| | | | | | |
|---|---|---|---|---|---|
| Your Ref: **Attn: Mr. Alan Chee** | | | | Date: **03/04/07** | |
| Item | Quantity | Part Number And Description | | Unit Price US $ | Amount US $ |
| 1) | 2 coils | Wire rope, Non-Rotating, 4 x 36 (39) Galvd, 32mm⌀ x lgths 220 mtr, one end mech-spliced with ordinary thimble | | 2300.00 | 4,600 00 |
| 2) | 2 coils | Wire rope, ungalvd 6 x Fi (39) IWRC, RHRL, 25mm⌀ x lgths 200 mtr, one end mech-spliced with ordinary thimble | | 700.00 | 1,400 00 |
| | | Above are c/w mill cert or in-house cert upon delivery. | | | |
| | | Total in US Dollars : | | | 6,000 00 |

GOODS SOLD ARE NOT RETURNABLE OR EXCHANGEABLE
GOODS RECEIVED IN GOOD ORDER & CONDITION

**PAID**
**1 0 AUG 2007**
**757477**

RECEIVED BY          E. & O.E.          ISSUED BY

**OCEAN CHINA INTERNATIONAL (S) PTE LTD**
101 KITCHENER ROAD, # 03-36, JALAN BESAR PLAZA, SINGAPORE 208511
TEL: 65 - 63967789 FAX: 65 - 63963389
Reg: 199704328K
Email : ociisin@starhub.net.sg

## TAX INVOICE

VESSEL:  MV SUMY                                    NUMBER:    6162
ARRIVED: 05-Aug-07                                  DATE  :   15-Sep-07
SAILDED : 30-Aug-07

                                                                      US$

### AGENCY FEES

| | | |
|---|---|---|
| 1 being agency fees for vessel's attendances | | |
| 05 - 06 Aug 07 | 1st 2 days | 500.00 |
| 07-30 Aug07 | 24 days x USD150.00 | 3,600.00 |
| | | 4,100.00 |

UNITED STATES DOLLARS:    FOUR THOUSAND ONE HUNDRED ONLY

OCEAN CHINA INTERNATIONAL (S) PTE LTD

 **Ocean China International (S) Pte Ltd 國洋般務 (新) 私人有限公司**

101 Kitchener Road #03-36 Jalan Besar Plaza Singapore 208511
Tel: 65 - 6396 7789  Fax: 65 - 6396 3389  Tlx: OCIL RS20689
Email: ocilsin@starhub.net.sg  Reg. No: 199704328K

## DISBURSEMENT

Bill No  :  D6660907B
Date   :  15-Sep-07

COMMERCIAL FLEET OF DONBASS L.L.C.
89 LUNINA AVE., MARIUPOL
UKRAINE 87510

ATTN: ACCOUNTS DEPARTMENT

### MV SUMY - 05/08/07 - 30/08/07

| NO. | DESCRIPTION | | INVOICE NBR | S$ | US$ |
|-----|-------------|--|-------------|----|----|
| 1 | Agency Fees | OCIL | 6162 | | 4,100.00 |
| 2 | Crew handling Fees | OCIL | 6163 | | 850.00 |
| 3 | Hotels | LIFE GOOD | 1389 | 1,788.00 | 1,192.00 |
| 4 | Transportation | GTS | 19583 | 239.00 | 159.33 |
| 5 | Sundries | OCIL | 6164 | | 1,143.19 |
| | | | | US$ | 7,444.52 |

UNITED STATES DOLLARS:    SEVEN THOUSAND FOUR HUNDRED FORTY FOUR
AND CENTS FIFTY TWO ONLY

OCEAN CHINA INTERNATIONAL (S) PTE LTD



**РОССИЙСКИЙ МОРСКОЙ РЕГИСТР СУДОХОДСТВА**
Представительство в Сингапуре

**RUSSIAN MARITIME REGISTER OF SHIPPING**
Representation in Singapore

Telephone: +65 65344507, Fax: +65 65387928
E-mail: rs270sng@pacific.net.sg

3 Phillip Street #16-02 Commerce Point
Singapore 048693

ROC Reg.No.  F 03664R

## TAX INVOICE

GST Reg.No.  M2-0073490-4

To:  ARDEMAR MARINE LIMITED

Addr:  24A, ARCHIMIDOUS STREET, ENGOMI,
NICOSIA 2411, CYPRUS

Attn:  Mr. Dodenko N.
Tel:  +357 (22) 313339
Fax:  +357 (22) 313346
E-mail:

VAT:

INVOICE № 07.110.270  dd  03.09.2007

№ and date of application / agreement
123  dd  10.08.2007

Document № and date of issue
Ship's Report issued  dd  03.09.2007

SUPERVISED  ITEM:  Occasional survey.

m/v "СУМЫ" / "SUMY",  Reg.№ 782578,  № IMO 7701691

| | Cost of rendered services in USD |
|---|---|
| -- Occasional survey | 5292.00 |
| NET AMOUNT: | 5292.00 |
| GST    0 % | 0.00 |
| TOTAL CHARGES: USD | 5292.00 |
| ( USD Five Thousand  Two Hundred Ninety Two - Only ) | |

Dear Sirs,
Please effect payment of this sum within 30 days after the date of the invoice through the account of Federal
State Institute "Russian Maritime Register of Shipping". The payment order should bear a reference to the
number of this invoice. The payment should be effected in USD. The Bank address for RS Head Office:
  Account No.40502840400109000033 with Bank JSC "INKASBANK", Branch 2,
  Narodnogo Opolcheniya Prospect, 198216, St.Petersburg, Russia; SWIFT: INKS RU 2P.
  Bank correspondent: Deutsche Bank Trust Company Americas,
  New York, USA; SWIFT: BKTR US 33, via correspondent account No.04419300 USD.



Yours faithfully,
FSI "Russian Maritime Register of Shipping"
Representation in Singapore

Authorized Signature



РОССИЙСКИЙ МОРСКОЙ РЕГИСТР СУДОХОДСТВА
RUSSIAN MARITIME REGISTER OF SHIPPING

6.3.10

№ 07.05198.279

## АКТ
## ОСВИДЕТЕЛЬСТВОВАНИЯ СУДНА
## REPORT
## ON SURVEY OF THE SHIP

Название судна / Name of ship: *СУМЫ / SUMY*

Идентификационный № / Identification No.: RS/PC 782878   Флаг / Flag: *Украина / Ukraine*

Место освидетельствования / Place of survey: *Сингапур / Singapore*   Дата / Date: *10.08 - 30.08.2007*

Нижеподписавшимся инженером–инспектором проведено
The undersigned surveyor has carried out

*внеочередное освидетельствование грузовых стрел кранов No.2 и No.3 по заявке судовладельца в связи с их повреждением.*

*При этом установлено следующее:*

*При проведении грузовых операций произошел обрыв троса топенанта крана No.2, стрела которого упала на леера кабины крана No.3 и перебила троса топенанта и грузового шкентеля крана No.3. В результате обрыва тросов стрела крана No.3 упала на фальшборт судна и получила значительные деформации. В связи с трудностью восстановления было принято решение об изготовлении новой крановой стрелы.*

*Стрела крана No.2 получила небольшое повреждение (имеет незначительное отклонение оси вправо) и может допущена к эксплуатации без ремонта при условии снижения её грузоподъемности с 25 т до 15 т.*

*Изготовление новой стрелы крана No.3 производилось на верфи SINGATAC ENGINEERING PTE LTD по проектному чертежу C2-10631(5) под техническим наблюдением РС. В новой стреле были использованы: существующие шкивы (8 штук), демонтированные со старой стрелы. Конструкция стрелы соответствует одобренной документации. При изготовлении стрелы использовались электроды марки E7018 4.0 мм, 5.0 мм и сварочная проволока марки E71T-1C 1.2мм, одобренные членами MAKO (CCS, LR, BV, ABS ). Все сварщики имеют Свидетельства об одобрении от BV. Сварные швы осмотрены визуально и проверены методом ультразвукового контроля, замечаний нет. Материал - сталь категории EH36N S=9 мм, S=20 мм (см.Сертификаты No.3455,67180). На кране No.3 и No.1 установлены новые грузовой шкентель (O 32 мм) и топенант (O 25 мм), см. Сертификаты No.07.05200.279 и No.07.05201.270 от 30.08.2007.*

*После монтажа новой стрелы на судне произведено испытание стрелы крана No.3 пробной нагрузкой согласно Правилам, состояние годное. По результатам испытаний на судно выдано Свидетельство ф.5.1.2 No.07.05196.270 от 30.08.2007.*

*В связи с заменой оси блока произведено испытание пробной нагрузкой грузового блока O 450 мм в районе гака согласно Правилам. По результатам испытаний на судно выдано Свидетельство ф.5.1.4 No.07.05197.270 от 28.08.2007.*

*Заключение:*

*По результатам произведенного освидетельствования грузовая стрела крана No.3 найдена годной и может быть допущена к эксплуатации. Необходимые записи о выполненном освидетельствовании и ограничении грузоподъемности крана No.2 внесены в Регистровую книгу судовых грузоподъемных устройств.*

12/2005

1 / 2

occasional survey of cargo jib of cranes No.2 and No. 3 with the application of shipowner in connection with their damages.

Upon examination the following was found:

During of cargo operations a breakage of span rope was in cargo jib No.2 and this jib has fallen on rails of cabins of crane No. 3 and has interrupted a span rope and cargo runner this crane . As a result of breakage of ropes the jib of crane No.3 has fallen on bulwarks of vessel and it has received a big damages. In connection with difficulty of restoration a jib the decision about manufacturing a new cargo jib was accepted.

The cargo jib of crane No.2 has received a small damages (has a small deviation of a vertical axis to the right) and can to be allowed to operation without repair at condition the decrease the cargo load with 25 t to 15 t.

Manufacturing of a new crane jib No.3 was made on shipyard SINGATAC ENGINEERING PTE LTD under the design drawing No.C2-10631(5) and technical supervision of RS. In a new jib were used the existing sheaves (8 pieces), demounted from an old jib. A construction of jib meets to the approved documentation. At manufacturing jib were used electrodes mark E7018 4.0 mm, 5.0 mm and a welding wire of mark E71T-1C 1.2 mm approved by members IACS (CCS, LR, BV, ABS). All welders have Certificates approval by BV. Welded seams were examined visually and with the ultrasonic control, no remarks . Material - steel of Grade EH36N S=9 mm, S=20 mm ( see ABS Certificates Nos. 3455, 67180).

A new cargo runner (diameter 32 mm) and span rope (diameter 25 mm) were installed in No.3 Crane and No.1 Crane, see Certificates No.07.05200.270 and No.07.05201.270 dated 30.08.2007. After mounting of new jib the test of crane No.3 by proof loading were made in vessel in accordance with RS Rules, condition is fit. The certificate ф.5.1.2 No.07.05196.270 dated 30.08.2007 was issued in vessel.

In connection with renew of block axis the cargo block O 450 mm was tested by proof loading (in area of a cargo hook). By results of tests the Certificate ф.5.1.4 No.07.05197.270 dated 28.08.2007 was given in the vessel.

The conclusion:

By results of survey the cargo jib of Crane No.3 found in fit condition and can be allowed to operation. Necessary entries about survey and restriction of cargo load of Crane No.2 were made in the Register of ship's lifting appliances and cargo handling gear.

Surveyor                    P. Shestakov

**BANGKOK MARINE SURVEY CO., LTD.**
Independent Marine & Cargo Surveyors.
6th Floor. Thalcon Tower, 507/321 Soi Sathuprach 31.
Sathuprach Road, Chongnonsee,
Yannawa, Bangkok 10120 Thailand
Tel: 02-674-1731~3 Fax: 674-1730
E-mail: bmsco@loxinfo.co.th

ใบแจ้งหนี้
**INVOICE**

**ORIGINAL**

| | |
|---|---|
| เลขที่ NO. | 1216/2007 |
| วันที่ DATE | 03/09/2007 |
| PAGE: | 1/2 |

อ้างถึง  CUR. REF :

บริษัท บางกอก มารีนเซอร์เวย์ จำกัด
507/321 อาคารธารินทาวเวอร์ ชั้น 5 ซอยสาธุประดิษฐ์ 31 ถนนสาธุประดิษฐ์ ช่องนนทรี ยานนาวา กทม. 10120
ทะเบียนการค้าเลขที่ 11439/2534 เลขประจำตัวผู้เสียภาษีอากร 3011055823
เลขประจำตัวผู้เสียการเงินเพิ่ม 107113501-1723

ลูกค้า
CUSTOMER

MESSRS. ARDEMAP MARINE LTD. NICOSIA, CYPRUS

C/O OFD SHIPPING LTD., MARIUPOL UKRAINE

AVENUE ADMIRALA LUNINA 89

DONETSK REGION, MARIUPOL

87510, UKRAINE.

ลูกค้าอ้างถึง  CUSTOMER ATTENTION TO
**MR. VLADIMIR BARYSHNIKOV**

อ้างถึง  CUSTOMER REF :

FOR ENQUIRY PLEASE CONTACT :
CAPT RICHARD C.ALLEN

ใบรายงานเลขที่ : REPORT REF
INS 91131/07

DIVISION REF

| | | |
|---|---|---|
| ชื่อสินค้า DESCRIPTION OF GOODS | สินค้าจาก GOODS SHIPPED FROM | ปลายทาง GOODS SHIPPED TO |
| เรือ VESSEL   M.V. " SUMY " | วันที่ DATE | วันที่ DATE |
| น้ำหนัก จำนวน WEIGHT QUANTITY | บรรจุ PACKED IN | ประเทศผู้ผลิต COUNTRY OF ORIGIN |
| หน่วยราคา UNIT PRICE | ต่อ PER : | มูลค่า VALUE |

| รหัส CODE | รายการ DESCRIPTION ชื่อ.ร้า ลิว ศีระน้อย | หน่วยละ UNIT PRICE | CURRENCY    USD จำนวนเงิน AMOUNT | FOR INTERNAL USE |
|---|---|---|---|---|
| | Cranes Damage Survey at Koh Sichang | | | |
| 01 | 29/07/2007 | | | |
| | - Bangkok to Sriracha ( 2 hours ) | @ 85.00 | 170.00 | |
| | - Motor Launch Koh Sichang | | 120.00 | |
| | - Survey on Board " Sumy " ( 4 hours ) | @ 85.00 | 340.00 | |
| | - Sriracha to Bangkok ( 2 hours ) | @ 85.00 | 170.00 | |
| 02 | 30/07/2007 | | | |
| | - Bangkok to Sriracha ( 2 hours ) | @ 85.00 | 170.00 | |
| | - Motor Launch Koh Sichang | | 120.00 | |
| | - Joint Survey on Board ( 3 hours ) | @ 85.00 | 255.00 | |
| | - Sriracha to Bangkok ( 2 hours ) | @ 85.00 | 170.00 | |
| 03 | 31/07/2007 | | | |
| | - Bangkok to Sriracha ( 2 hours ) | @ 85.00 | 170.00 | |
| | - Motor Launch | | 120.00 | |
| | - Survey on Board ( 2 hours ) | @ 85.00 | 170.00 | |
| | - Sriracha to Bangkok ( 2 hours ) | @ 85.00 | 170.00 | |

E x P E จำ ตาม ราคา

| | | |
|---|---|---|
| รวมจำนวนเงิน SUB TOTAL | Cont / 2 | ผู้จัดทำ PREPARED BY |
| VAT 7% | ภาษีมูลค่าเพิ่ม VALUE ADDED TAX | ผู้อนุมัติ APPROVED BY |
| | จำนวนเงินรวมทั้งสิ้น GRAND TOTAL | |

| BANGKOK MARINE SURVEY CO., LTD. | ใบแจ้งหนี้ | ORIGINAL | |
|---|---|---|---|
| Independent Marine & Cargo Surveyors. | INVOICE | เลขที่ / NO. | 1218/2007 | หน้า |
| 9th Floor, Thaicen Tower, 507-331 Soi Sathupradit 31. | | | DAY MONTH YEAR | PAGE: |
| Sathupradit Road, Chongnonsee | OUR REF : | วันที่ / DATE | 03/08/2007 | 2/2 |

ลูกค้า / CUSTOMER

MESSRS. ARDEMAR MARINE LTD., NICOSIA, CYPRUS

C/O CFD SHIPPING LTD., MARIUPOL, UKRAINE.

AVENUE ADMIRALA LUNINA, 69

DONETSK REGION, MARIUPOL

87510, UKRAINE.

บริษัท บางกอก มารีนเซอร์เวย์ จำกัด

ชั้น 9 อาคารไทยเฉินทาวเวอร์ ชั้น 5 และเลขประดิษฐ์ 31 ถนนสาธุประดิษฐ์ ช่องนนทรี ยานนาวา กทม. 10120

ทะเบียนการค้าเลขที่ 11439/2534 เลขประจำตัวผู้เสียภาษีอากร 3011055823
เลขประจำตัวผู้เสียภาษีมูลค่าเพิ่ม 107113501-1728

บุคคลอ้างอิง / CUSTOMER ATTENTION TO
MR. VLADIMIR BARYSHNIKOV

อ้างอิง / CUSTOMER REF :

FOR ENQUIRY PLEASE CONTACT :
CAPT RICHARD C.ALLEN

ใบรายงานเลขที่ / REPORT REF. :
HS 01121/07

DIVISION/REF. :

รายการ / DESCRIPTION OF GOODS
ชื่อ / VESSEL : M.V. " SUMY "

GOODS SHIPPED FROM
วันที่ / DATE :

GOODS SHIPPED TO
วันที่ออก :

น้ำหนัก จำนวน / WEIGHT QUANTITY :

บรรจุใน / PACKED IN :

ประเทศผู้ผลิต / COUNTRY OF ORIGIN

หน่วยละ / UNIT PRICE :

ต่อ / PER

มูลค่า / VALUE

| รหัส CODE | รายการ DESCRIPTION | หน่วยละ UNIT PRICE ต่อ ใน Figure | CURRENCY USD จำนวนเงิน AMOUNT | FOR INTERNAL USE |
|---|---|---|---|---|
| 04 | Photographs 2 sets 51 prints | @ 0.50 | 51.00 | |
| 05 | Reporting ( 3 hours) | @ 60.00 | 180.00 | |
| 06 | Courier / Communications | | 75.00 | |

<u>REMARK</u> : PLEASE REMIT BY T.T ONLY TO BANGKOK BANK PUBLIC COMPANY LIMITED
SATHUPPRADIT BRANCH, BANGKOK, THAILAND
SAVINGS ACCOUNT NUMBER : 171-0-62319T
SWIFT CODE BKKBTHBK

E & O E เว้น

| | รวมจำนวนเงิน SUB TOTAL | 2,451.00 |
|---|---|---|
| VAT 7% | ภาษีมูลค่าเพิ่ม VALUE ADDED TAX | 171.57 |
| | จำนวนเงินรวมทั้งสิ้น GRAND TOTAL | 2,622.57 |

ผู้จัดทำ / PREPARED BY

ผู้อนุมัติ / APPROVED BY

# MONJASA
### Bunkering knowledge

| | INVOICE # | 22305 |
|---|---|---|

M/V SUMY and/or master and/or
owners and/or charterers and/or
managers and/or operators and/or
Donbass Commercial Fleet
89, Lunin Avenue
87510 - Mariupol
Ukraine

| | |
|---|---|
| Invoice Date | 30-08-07 |
| Delivery Date | 30-08-07 |
| Your Ref | Alexey Pavlov |

We hereby debit you concerning SUMY (imo: 7701691) delivered at Singapore as follows:

| Product Description | Quantity | Unit | Price/Unit | Total |
|---|---|---|---|---|
| Gasoil DMA | 39,9700 | MTS | 633,00 | 25.301,01 |

| Total amount due in USD | 25.301,01 |
|---|---|

*Remark:*
*Bunker Reciept(s) enclosed.*

**PAYMENT MUST BE RECIEVED IN FULL BY OUR BANK BEFORE OR ON DUE DATE AND
WITHOUT ANY DEDUCTIONS. ALL BANK CHARGES ARE FOR BUYER'S ACCOUNT.**

Payment should be instructed from you no later than: 27-09-07

For Late payment, a monthly interest of 2% per month will apply.
The interest will be calculated for each overdue day.

| Please pay to: | | | | |
|---|---|---|---|---|
| | Beneficiary | Monjasa A/S | S.W.I.F.T | NDEADKKKXXX |
| | Reference | Invoice no. 22305 | Account / IBAN | DK80 2000 5005 9915 38 |
| | Bank | Nordea Bank USD | Bank slip to fax | +45 70 260 233 |

Please scan a copy of your bank slip and email it to accounts@monjasa.com or fax it to +45 70 260 233

In case of questions, you are welcome to contact our accounts department on phone +45 70 260 230

| | | | |
|---|---|---|---|
| Monjasa A/S | | Phone | +45 70 260 230 |
| Strevelinsvej 4 | | Fax | +45 70 260 233 |
| Fredericia | VAT No. DK26480531 | Email | denmark@monjasa.com |

EXHIBIT "D"

**(ATTACHMENT 13)**

**Owners' Final Hire Statement**
           **12.11.2007**

Vessel          MV "SUMY"

C/P date        28.06.2007

Broker           Lerbret

Daily rate      USD21,000pdpr

Owners                    Ardemar Marine Limited,Nicosia, Cyprus

Delivery        08.07.2007      00:00

Redelivery     21.10.2007      12:00


1.  **Total Hire**

    105.5 days                                                      **USD2,215,500.00**

2.  **25% off hire/Breakdown of crane No.2**

    19.07.07 1800 – 20.07.07 0200          (0.08 days)            -USD1,680.00

    Bunkers adjustment –MGO (USD700 2MT x 0.08 days)              -USD112.00

    **Total breakdown of crane No.2**                               -
**USD1,794.84**

3.  **Owners' expenses**

    Dakar                                                -USD525.00

    Owners' second item in Dakar                         -USD1,500.00

    Handling fees in Dakar                               -USD50.63

    **Total Owners' expenses**                           **-USD2,075.63**

4.  **Commission**

    Address commission (2,215,500 - 1,680 = 2,213,820 x 2.5%)      -
USD55,345.50

Brokerage (2,215,500 - 1,680 = 2,213,820 x 1.25%)                    -
USD27,672.75

**Total commission**                                                =
**USD83,018.25**

5. **Bunkers on board at time of delivery**

   IFO (364.50MT x USD400)                              USD145,800.00

   MGO (49MT x USD700)                                  USD34,300.00

   **Total bunkers on delivery**
   **USD180,100.00**

6. **Bunkers on board at time of redelivery**

   IFO (331.10MT x USD400)                             -USD132,440.00

   MGO (51MT x USD700)                                        -
USD35,700.00

   **Total bunkers on redelivery**                           =
**USD168,140.00**

7. **CVE**

   USD1,100 per month                                   **USD3,868.33**

8. **Amount remitted:**

   First hire payment                                  -USD483,837.50

   Second hire payment                                        -
USD483,837.50

   Third hire payment                                  -USD 164,340.73

   Fourth hire payment                                 -USD245,132.50

   Fifth hire payment                                  -USD139,668.54

   **Total remitted**                                         -
**USD1,516,816.77**


**BALANCE IN OWNERS' FAVOUR**
**USD627,623.07**